# Report of Lance R. Youles

**Estate of Donald Cohen v. Golden Living Center - Heathwood, et al.**

Lance R. Youles certifies and describes as follows:

1. I was retained by the Tennyson Law Firm which represents the Plaintiff in this manner.

2. This report was produced by my office.

3. For purposes of this report, all references made to "Golden" shall mean Golden Living Center – Heathwood, Golden Holdings, LLC, Golden Living – Home Office, Golden Ventures – Administrative Services, GGNSC Clinical Services, GGNSC Clinical Services – Clinical, GGNSC Clinical Services – Dietary, and GGNSC Clinical Services – Social Services. This includes Golden board(s) of directors, Management Company, Administrator, Director of Nursing (DON), staff, and consultants.

4. For purposes of this report, all references made to "Governing Body" shall mean Golden Holdings, LLC, Golden Living – Home Office, and Golden Ventures – Administrative Services,

## RECORDS RECEIVED, ACQUIRED, REVIEWED, AND RELIED UPON

5. I have reviewed records and information from the following facilities, agencies, individuals, and sources concerning Donald Cohen:

   A. <u>Death Certificate</u>;
   B. <u>Miscellaneous photographs and video</u>;
   C. <u>Golden: Miscellaneous admission and medical records</u>;
   D. <u>Newton – Wellesley Hospital: Miscellaneous medical records</u>;
   E. <u>Brigham & Women's Hospital: Miscellaneous medical records</u>;
   F. <u>Massachusetts Department of Public Health (DPH), Division of Health Care Quality: Miscellaneous Golden licensing and inspection records including the 4/24/13 survey regarding Mr. Cohen</u>;
   G. <u>www.medicare.gov: Background research regarding Golden; and</u>,
   H. <u>Law firm correspondence</u>.

## MY BACKGROUND, EDUCATION, AND TRAINING

6. I am a graduate of Ferris State University in Big Rapids, Michigan, with a Bachelor of Science degree in Health Services Management, and an Associate of Science degree in Occupational Safety and Health, both received in 1978.

7. I have been a Licensed Nursing Home Administrator (LNHA) in good standing since 1978.

1

8. I have practiced, managed, or consulted in nursing facilities, assisted living facilities, and senior housing businesses since 1978. My background ranges from high school experiences as a nurse's aide to post college roles as an administrator, multi-facility management, turnaround specialist, and facility ownership. My management experience and knowledge of eldercare laws, regulations, and standards ranges from subacute nursing facilities to home health care.  Most of my career has been devoted to helping nursing facilities in financial and/or regulatory peril throughout the country.  My consulting roles include receivership, temporary management, and monitoring appointments for the State of Michigan.  In addition, I served as an expert witness for the State of Indiana, Office of the Attorney General, to evaluate the competency of nursing home administrators under administrative review for managing nursing facilities that received substandard quality of care violations.

## MY NURSING HOME EXPERTISE

9. Based upon my education, training, experience, and research, I am familiar with the standards of care for nursing facilities operating in Massachusetts from 2011 to 2013 and currently.

10. Based upon my education, training, experience, and research, I am familiar with the standards of practice for Nursing Home Administrators operating in Massachusetts from 2011 to 2013 and currently.

11. Based upon my experience as a consultant, corporate executive, and owner of nursing facilities, I am qualified to opine on the duties of a Governing Body. This includes hiring a competent administrator, establishing, monitoring, and enforcing internal operating standards, maintaining compliance with state and federal regulations, providing sufficient facility resources and operating capital, promoting ethical management practices, and to pursue facility profitability without compromising the quality and continuity of resident care.

12. During my professional career I have experience with nursing home residents who were at high risk of negative outcomes due to their diagnoses and complete dependency on facility governing boards, administration, management, and staff to ensure that they attain or maintain their highest practicable physical, mental, and psychosocial well-being in accordance with state and federal (CMS) laws and regulations.

13. I possess highly specialized knowledge and expertise in the field of nursing home administration, multi-facility management, ownership, eldercare laws, regulations, industry standards, and resident rights.  Please see attached CV.

## SCOPE OF MY REVIEW

14. As is customary for professionals in my field, I have relied on my assessment of Mr. Cohen's medical records, Golden records, DPH records, research, and other relevant information to formulate opinions concerning the standard of care at Golden during his stay in general and <u>on 3/12/13 in particular</u>.

2

15. The opinions expressed in this report are limited to the operation of Skilled and Intermediate Care Nursing Facilities in Massachusetts. The scope of my review includes regulatory compliance, internal standards, facility ownership/governance, corporate control and oversight, facility administration, day-to-day operations, caregiver staffing, operating policies and procedures, caregiver competency, unsafe caregiver acts, unsafe facility conditions, resident rights, and the hiring, training, direction, supervision, and management of individuals who practiced or worked at Golden during Mr. Cohen's stay.

16. My findings and opinions may reference practitioners, clinicians, and unlicensed staff as employees, agents, or contractors of Golden, but only to the extent of their conformance with nursing home laws, regulations, internal policies and procedures, industry practices, and other <u>regulatory</u>, <u>administrative</u>, and <u>institutional</u> standards.

**APPLICABLE STANDARDS**

17. Donald Cohen was entitled to receive nursing home care, treatment, protection, and services in accordance with the following standards:

    - Volume 42, Code of Federal Regulations, Part 483;
    - Volume 42, Code of Federal Regulations, Part 488;
    - Massachusetts General Laws Title XVI, Chapter 111, Section 71;
    - Massachusetts Administrative Code, Title 105, Sections: 150.000 – 159.000;
    - Massachusetts Administrative Code, Title 245, Section 2.00;
    - Nursing home industry standards; and,
    - Golden internal operating standards, i.e., policies, procedures, protocols, systems, job descriptions, etc.

18. The role, authority, and duties of nursing home administrators in Massachusetts are defined as follows:

    <u>42 C.F.R. § 483.75</u>:

    "A facility must be administrated in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing of each resident."

    <u>105 CMR 150.002 (C)</u>:

    "The administrator of the facility shall be responsible to the licensee and shall operate the facility to ensure that services required by patients or residents at each level of care are available on a regular basis and provided in an appropriate environment in accordance with established policies."

    <u>245 CMR 2.02</u>:

    "Nursing home administrator means any person charges with the general administration of nursing home, whether or not such a person has an ownership interest in the home, who has been licensed and registered as such by the board in accordance with the provisions of M.G.L. c. 112 §108."

3

19. Resident **NEGLECT** in Massachusetts nursing facilities is defined as follows:

> # Resident Neglect
> **42 C.F.R. § 488.301:**
>
> "Failure to provide goods and services necessary to avoid physical harm, mental anguish or mental illness."
>
> **105 CMR § 155.003:**
>
> "Failure to provide goods and services necessary to avoid physical harm, mental anguish or mental illness. In determining whether or not neglect has occurred, the following standards shall apply:
> (1). A patient or resident has been neglected if:
> (a) An individual has failed to provide appropriate care, treatment or service to the patient or resident; and
> (b) The individual's failure to provide the treatment, care or service to the patient or resident is either intentional or the result or carelessness; and
> (c) As a result of the failure to provide the treatment, care or service, the individual has failed to maintain the health or safety of the patient or resident, as evidenced by harm to the patient or resident, or a deterioration in the patient or patient's physical, mental or emotional condition."

20. An **AVOIDABLE ACCIDENT** in Massachusetts nursing facilities is defined as follows:

> # Avoidable Accident
> **42 C.F.R. § 483.25 (h)(1) and (2) – "Guidance to Surveyors"**
>
> "AVOIDABLE ACCIDENT means that an accident occurred because the facility failed to:
> - Identify environmental hazards and individual resident risk of an accident, including the need for supervision; and/or
> - Evaluate/analyze the hazards and the risk; and/or
> - Implement interventions, including adequate supervision, consistent with a resident's needs, goals, plan of care, and current standards of practice in order to reduce the risk of an accident; and/or
> - Monitor the effectiveness of the interventions and modify the interventions as necessary, in accordance with current standards of practice."

21. **ADEQUATE SUPERVISION** in Massachusetts nursing facilities is defined as follows:

> # Adequate Supervision
> **42 C.F.R. § 483.25 (h)(1) and (2) – "Guidance to Surveyors"**
>
> "Adequate supervision refers to an intervention and means of mitigating the risk of an accident. Facilities are obligated to provide adequate supervision to prevent accidents. Adequate supervision is defined by the type and frequency of supervision, based on the individual's assessed needs and identified hazards in the resident environment."

## BACKGROUND

22. **Golden is a 49 bed for-profit Skilled Nursing Facility in Chestnut Hill, Massachusetts.**

23. Golden is operated by <u>Golden Living Centers</u>, a national for-profit privately held company that operates over 300 facilities in 21 States.

24. Golden is licensed and regulated by the Massachusetts Department of Public Health (DPH), Division of Health Care Quality.

25. Rosemary McLaughlin was the Executive Director (Administrator) during Mr. Cohen's stay at Golden.

26. Kathleen Silva, RN was the DON during Mr. Cohen's stay at Golden.

27. **Donald Cohen was a 79-year-old resident who was admitted to Golden on 8/15/11 for (24) hour nursing care, supervision, and assistance with his ADL's.**

28. Mr. Cohen was represented at Golden by his son Steven Cohen and daughter Jennifer Katz, who acted on his behalf.

29. Mr. Cohen relied on the Medicare Program and Massachusetts Medicaid Program to pay for his stay at Golden.

## FINDINGS

30. Donald Cohen was <u>completely dependent on Golden</u> for (24) hour nursing care, treatment, supervision, and protection due to limitations imposed by the following diagnoses:

    - **Senile dementia**
    - **Depression**
    - **Hypertension**
    - **Diabetes mellitus type II**
    - **Congestive heart failure**
    - **Coronary artery disease**
    - **Hyperplasia prostate**
    - **Idiopathic cardiomyopathy**
    - **Hyperlipidemia**
    - **Adenocarcinoma**
    - **BPH**
    - **Reactive airway disease**
    - **Failure to thrive**
    - **Chronic headache**

31. Mr. Cohen was considered a **HIGH FALL RISK** at Golden.

32. Mr. Cohen exhibited **WANDERING BEHAVIOR** during his stay at Golden.

33. Mr. Cohen is described as follows according to a <u>1/18/13</u> "Minimum Data Set (MDS)" at Golden:

    - Quarterly assessment
    - Divorced
    - Admitted from acute hospital
    - Sometimes understands
    - Sometimes understood
    - Extensive assistance with (1) person physical assist for transfers, walking in room, walking in corridor, locomotion on/off unit, dressing, eating, toilet use, and personal hygiene
    - Extensive assistance with (2) persons physical assist for bed mobility
    - Total dependence for bathing
    - Unsteady balance
    - Mobility via walker and wheelchair
    - Incontinent of bowel and bladder
    - No pain symptoms
    - **LIFE EXPECTANCY IS GREATER THAN 6 MONTHS**
    - No problem conditions
    - No falls since admission (ERROR)
    - 5' 8" – 154 lbs.
    - No recent weight loss or gain
    - Mechanically altered diet
    - No pressure ulcers/skin breakdown
    - Receiving a diuretic
    - Not receiving physical, occupational, or speech therapy
    - No physical restraints in use

34. The following interventions were in effect at Golden <u>on/before 3/12/13</u> according to Mr. Cohen's care plan:

    Focus:   At risk for falls related to: Wandering, history of falls, resident not complying with safety measures.

    - Assess wheelchair for proper size
    - Self-releasing wheelchair seatbelt/alarm
    - Bed alarm
    - Low bed
    - Wheelchair anti-tippers
    - Physical therapy evaluations
    - Physical therapy strengthening
    - Extending bedtime to late in the shift
    - Toilet prior to placing in bed
    - Non-skid socks when in bed
    - Offer urinal at night

35. Mr. Cohen's stay at Golden was characterized by a **fall-related head injury** on 3/12/13 as follows:

# "The Fall"

### Donald Cohen at Golden Living Center – Heathwood (Golden)

| | |
|---|---|
| DAY/DATE/TIME: | Tuesday 3/12/13 @ 11:30 a.m. |
| LOCATION: | Resident hallway |
| NURSING SHIFT: | Day |
| TIMING: | Resident lunch period |
| ACUITY STATUS: | Long term care |
| DESCRIPTION OF INCIDENT: | "He was sitting in his w/c in the corridor and attempted to self-ambulate and fell to the floor. He has baseline confusion and restlessness." [Quote: Progress note @ 2:27 p.m. on 3/12/13] |
| POST-FALL ASSESSMENT: | "He is not able to articulate his pain situation. He has a large bump on his right temporal lobe and is very tender to touch. He has baseline strength of the upper and lower extremities, perla, neuro signs wnls and baseline confusion." [Quote: Progress note @ 2:27 p.m. on 3/12/13] |
| WITNESSED BY STAFF: | No |
| POST-FALL TREATMENT: | Mr. Cohen remained at the facility under observation (i.e., neuro checks) per house protocol, and to receive ice every (2) hours to the temporal lobe x 48 hours |
| ATTENDING PHYSICIAN NOTIFIED: | Yes, treatment orders were given by Nurse Practitioner |
| FAMILY/POA NOTIFIED: | Yes, Steven Cohen (Son) at approximately 1:00 p.m. |
| FAMILY RESPONSE: | Upon her arrival, Jennifer Katz (daughter) asked Golden staff to transfer Mr. Cohen to the emergency room for evaluation due to <u>extensive facial bruising</u>. |
| STAFF RESPONSE: | Mr. Cohen was transferred to the emergency room in response to his daughter's request, but the transfer did not occur until approximately 9:00 p.m. |
| ASSISTIVE DEVICE(S) IN USE: | Alarmed seatbelt |
| ELAPSED TIME FROM FALL TO ER TRANSFER: | 9+ hours |
| ADEQUATE STAFFING AT TIME OF FALL: | No, not witnessed by staff despite being in a public area |
| EFFECTIVE POST-FALL ASSESSMENT: | No, because the <u>hospital transfer was prompted by his family and not Golden staff</u> |
| REPORTED TO DPH: | Yes, but the 4/24/13 survey was inconclusive |
| NEGATIVE OUTCOME: Source: Medical Records | Mr. Cohen was transferred to Newton-Wellesley Hospital on 3/12/13 where he was diagnosed with a <u>Left-Sided Subdural Hematoma</u>. He never recovered from his injuries at Golden and died at Brigham and Women's Hospital on 3/18/13 |
| CAUSE OF DEATH (I.E., DEATH CERTIFICATE): | <u>Atherosclerotic Cardiovascular Disease</u> |
| SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH: | <u>Blunt trauma to head</u> |
| DESCRIBE HOW INJURY OCCURRED: | <u>Fell</u> |
| DEPENDENCY/RISK FACTORS PRIOR TO FALL: Source: Medical Records | * HIGH FALL RISK<br>* History of falls<br>* Cognitive impairment<br>* Wandering behavior<br>* Unsteady gait<br>* Abnormal posture<br>* Poor safety awareness<br>* Poor attention span<br>* Noncompliant with safety devices<br>* Mobility via wheelchair – propels self |

## CONCLUSIONS

36. The following conclusions were reached during the course of my records review, research, and analysis:

   A. Donald Cohen was completely dependent on Golden management and staff for his nursing care, treatment, supervision, and protection.

   B. **Mr. Cohen was a victim of NEGLECT at Golden based on failures identified in this report and standards identified in paragraphs (17) – (21).**

   C. **Mr. Cohen's fall on 3/12/13 constitutes an AVOIDABLE ACCIDENT as defined in paragraph (20), and based on the following evidence:**

   - Mr. Cohen had a history of falls
   - Mr. Cohen was considered a high fall risk
   - Mr. Cohen exhibited wandering behavior which not only increased the likelihood of falls, but required a greater level of supervision due to his mobility and greater access to accident hazards
   - Mr. Cohen was cognitively impaired and could not be relied upon to ask for assistance or act in a safe manner
   - <u>Golden completely relied on an alarmed seatbelt to prevent his falls</u>, (i.e., passive care plan intervention), rather than providing greater face-to-face/individualized staffing (i.e., active interventions)
   - Mr. Cohen was noncompliant with safety devices
   - There is <u>no CNA documentation</u> that his seatbelt was "visually" checked every 15 minutes in accordance with physician orders
   - "Timing of the fall" (i.e., resident lunch period) when caregivers often congregate in resident dining areas, which can significantly reduce face-to-face supervision in resident hallways/rooms. Resident meal periods are a well-recognized hazard in the nursing home industry. These foreseeable "risk windows" are identified by: Youles, Lance R., "Preventing Neglect"; <u>Advance for Long-Term Management</u>; posted on 2/16/11
   - Mr. Cohen's fall was not witnessed by staff
   - Staff did not respond to Mr. Cohen's alarm until after he fell

   D. **Golden failed to provide ADEQUATE SUPERVISION to Mr. Cohen during the late morning hours of 3/12/13 as defined in paragraph (21).**

   E. **There was an undue delay of (9+) hours on 3/12/13 from Mr. Cohen's fall to his hospital transfer, which was prompted by his daughter Jennifer Katz and <u>not Golden staff</u>.**

   F. Mr. Cohen was NOT classified as end-stage, terminal, or enrolled in hospice <u>prior to his fall on 3/12/13</u> according to his last MDS at Golden.

   G. Providing an effective facility administrator more likely than not would have prevented Mr. Cohen's negligent care and treatment at Golden.

H. Properly supervising floor nursing staff more likely than not would have prevented Mr. Cohen's negligent care and treatment at Golden.

I. Providing an effective falls program more likely than not would have prevented Mr. Cohen's negligent care and treatment at Golden.

J. Assigning sufficient direct care staff <u>to Donald Cohen</u> more likely than not would have prevented his negligent care and treatment at Golden.

K. As a nursing home administrator who is responsible for administering a facility in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident under state and federal standards/safety rules, I found evidence that Donald Cohen was a victim of NEGLECT at Golden. In particular, effective leadership from the facility administrator more likely than not would have prevented his negligent care and treatment.

## RECORDS REQUESTED

37. The following records are expected to result in additional opinions when I receive them:

   - All narrative nurse's notes during Mr. Cohen's stay
   - All CNA flowsheets including <u>15 minute alarmed seatbelt checks</u>
   - All physician verbal orders during Mr. Cohen's stay
   - HPPD (Hours-Per-Patient-Per-Day) **direct care** staffing records (2011 – 2013)
   - All standard and complaint DPH surveys (2011 – 2013)
   - Floor nurse and CNA assignment sheets on Mr. Cohen's unit during his stay
   - Nursing staff in-service records (2011 – 2013)
   - Resident council meeting minutes (2011 – 2013)
   - Golden governing body meeting minutes (2011 – 2013)
   - Golden Medicare and Medicaid Cost Reports (2011 – 2013)

## OPINION

38. **Based on my education, training, management expertise, regulatory knowledge, and knowledge of skilled nursing facilities, it is my belief to a reasonable degree of professional certainty that the board(s) of directors, Management Company, Administrator, DON, staff, and consultants at Golden failed to provide the necessary care and services for Donald Cohen to attain or maintain his highest practicable physical, mental, and psychosocial wellbeing which constitutes resident NEGLECT. The failure of Golden to provide the necessary care and to prevent the management failures identified in this report caused and/or significantly contributed to his negligent care and treatment. Accordingly, Golden fell below the standard of care for a skilled nursing facility operating in Massachusetts based on standards identified in paragraphs (17) – (21) in general and the following failures in particular:**

9

A. **FAILURE TO PREVENT RESIDENT NEGLECT;**

| **Applicable Standards:** | **Breach of Applicable Standards:** |
|---|---|
| * Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.13 (b) & (c), F-224 |
|  | 42 C.F.R. § 488.301 |
| * Massachusetts Statutes/Administrative Rules | 105 CMR § 155.003 |
| * Industry Standards (MA & US): | Apply, and there is a breach. |

B. **FAILURE TO PROVIDE A SAFE ENVIRONMENT AND ADEQUATE SUPERVISION TO PREVENT ACCIDENTS; AND,**

| **Applicable Standards:** | **Breach of Applicable Standards:** |
|---|---|
| * Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.25 (h), F-323 |
| * Massachusetts Statutes/Administrative Rules: | 105 CMR § 150.007 (G)(d) |
| * Industry standards (MA & US): | Apply, and there is a breach |

C. **FAILURE TO PROVIDE EFFECTIVE FACILITY ADMINISTRATION.**

| **Applicable Standards:** | **Breach of Applicable Standards:** |
|---|---|
| * Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.75, F-490 |
| * Massachusetts Statutes/Administrative Rules: | 105 CMR § 150.002 (C) |
|  | 242 CMR 2.02 |
| * Industry Standards (MA & US): | Apply, and there is a breach |

## CLOSING COMMENTS

39. I have not prepared any exhibits at the present time. However, I reserve the right to refer to any documents reviewed as exhibits if I amend my report or provide testimony in this matter.

40. I offer my opinions with confidence. However, I reserve the right to amend my report if significant additional information becomes available through discovery in this matter.

41. All findings and opinions contained within this report are based on the records provided to me, research, my education, training, and extensive experience with matters involving resident abuse and neglect.

Respectfully submitted:

_____   November 17, 2016
Lance R. Youles, BS, LNHA

11