# Supplemental Report

Lance R. Youles certifies and describes as follows:

1. I am competent to testify to the statements contained within.

2. I was retained by the Tennyson Law Firm which represents the Plaintiff in this manner.

3. This report was produced by my office.

4. For purposes of this report, all references made to "Golden" shall mean Golden Living Center – Heathwood, Golden Holdings, LLC, Golden Living – Home Office, Golden Ventures – Administrative Services, GGNSC Clinical Services, GGNSC Clinical Services – Clinical, GGNSC Clinical Services – Dietary, and GGNSC Clinical Services – Social Services. This includes Golden board(s) of directors, Management Company, Administrator, Director of Nursing (DON), staff, and consultants.

5. For purposes of this report, all references made to "Governing Body" shall mean Golden Holdings, LLC, Golden Living – Home Office, and Golden Ventures – Administrative Services.

## NURSING HOME ADMINISTRATOR STANDARDS

6. The role, authority, and duties of nursing home administrators in Massachusetts are defined as follows:

    <u>42 C.F.R. § 483.75</u>:

    "A facility must be administrated in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing of each resident."

    <u>42 C.F.R. § 483.70, Guidance to Surveyors</u>:

    "The facility's administration is not limited to the administrator and may also include the facility's governing body, Management Company, and/or others identified by the facility as part of the facility administration."

    "The investigation must demonstrate how the administration knew or should have known of the deficient practice and how the lack of administration involvement contributed to the deficient practice found."

    <u>105 CMR 150.002 (C)</u>:

    "The administrator of the facility shall be responsible to the licensee and shall operate the facility to ensure that services required by patients or residents at each level of care are available on a regular basis and provided in an appropriate environment in accordance with established policies."

1

<u>245 CMR 2.02</u>:

"Nursing home administrator means any person charges with the general administration of nursing home, whether or not such a person has an ownership interest in the home, who has been licensed and registered as such by the board in accordance with the provisions of M.G.L. c. 112 §108."

> The role of nursing home administrator was created to ensure that physicians, nurses, and other professionals comply with nursing home laws, regulations, and standards.

## APPLICABLE NURSING HOME STANDARDS

7. The scope of my expert opinions are based on the following nursing home laws, regulations, standards, and practices:

   - Volume 42, Code of Federal Regulations, Part 483;
   - Massachusetts General Laws Title XVI, Chapter 111, Section 71;
   - Massachusetts Administrative Code, Title 105, Sections: 150.000 – 159.000;
   - Massachusetts Administrative Code, Title 245, Section 2.00;
   - Other nursing home standards in Massachusetts;
   - Nursing home industry standards; and,
   - Golden internal operating standards, (i.e., policies, procedures, protocols, systems, job descriptions, etc.).

8. The following federal (CMS) regulatory doctrine constitutes the essence of Volume 42, Code of Federal Regulations, Part 483, Subpart B:

> ### Essence of 42 C.F.R. § 483, Subpart B
>
> "Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care."

9. An **AVOIDABLE ACCIDENT** in Massachusetts nursing facilities is defined as follows:

> ### Avoidable Accident
> <u>42 C.F.R. § 483.25 (h)(1) and (2), F-323 – Guidance to Surveyors</u>
>
> "AVOIDABLE ACCIDENT means that an accident occurred because the facility failed to:
>
> * Identify environmental hazards and individual resident risk of an accident, including the need for supervision; and/or
> * Evaluate/analyze the hazards and the risk; and/or
> * Implement interventions, including adequate supervision, consistent with a resident's needs, goals, plan of care, and current standards of practice in order to reduce the risk of an accident; and/or
> * Monitor the effectiveness of the interventions and modify the interventions as necessary, in accordance with current standards of practice."

10.  **ADEQUATE SUPERVISION** in Massachusetts nursing facilities is defined as follows:

> ## Adequate Supervision
> <u>42 C.F.R. § 483.25 (h)(1) and (2) – "Guidance to Surveyors"</u>
>
> "Adequate supervision refers to an intervention and means of mitigating the risk of an accident. Facilities are obligated to provide adequate supervision to prevent accidents. Adequate supervision is defined by the type and frequency of supervision, based on the individual's assessed needs and identified hazards in the resident environment."

11.  Resident **NEGLECT** in Massachusetts nursing facilities is defined as follows:

> ## Resident Neglect
> <u>42 C.F.R. § 488.301</u>:
>
> "Failure to provide goods and services necessary to avoid physical harm, mental anguish or mental illness."
>
> <u>105 CMR § 155.003</u>:
>
> "Failure to provide goods and services necessary to avoid physical harm, mental anguish or mental illness.  In determining whether or not neglect has occurred, the following standards shall apply:
> (1).  A patient or resident has been neglected if:
> (a) An individual has failed to provide appropriate care, treatment or service to the patient or resident; and
> (b) The individual's failure to provide the treatment, care or service to the patient or resident is either intentional or the result or carelessness; and
> (c) As a result of the failure to provide the treatment, care or service, the individual has failed to maintain the health or safety of the patient or resident, as evidenced by harm to the patient or resident, or a deterioration in the patient or patient's physical, mental or emotional condition."

12.  A **CHAIN ORGANIZATION** is defined by CMS as follows:

> ## Chain Organization
>
> "For Medicare and/or Medicaid purposes, a chain organization consists of a group of two or more health care facilities or at least one health care facility and any other business or entity owned, leased, or, through any other device, controlled by one organization. Chain organizations include, but are not limited to, chains operated by proprietary organizations and chains operated by various religious, charitable, and governmental organizations. A chain organization may also include business organizations engaged in other activities not directly related to health care."
>
> Source:   Medicare Provider Reimbursement Manual, Part 2, Provider Cost Reporting Forms and Instructions, Chapter 39, Form CMS 287-05

### APPLICABLE PUBLICATIONS

13.  Youles, Lance R., "Negligent Retention Parts I and II"; <u>Advance for Long-Term Management</u>; posted in May/August 2014.

## NURSING HOME FALL PREVENTION ROLES

14. **FALL PREVENTION ROLES** in nursing facilities are as follows:

---

### FALL PREVENTION ROLES

#### Administrators
<u>Planners, Organizers, Directors, and Controllers</u>:

Chiefly responsible for providing the essential components of a falls prevention program" (i.e., internal policies & procedures, competent staff, individualized staffing levels for high risk residents, accurate care plans with measurable and effective interventions, physical & occupational therapy, restorative nursing care, access to state-of-the-art devices/equipment, documentation standards, safe building and environment that is free of accident hazards, timely communication between staff, physicians, & family members, effective staff supervision, and effective training). Closely monitor staff compliance with MA, Federal, and Internal standards to ensure the falls program is effective, and personally intervene when necessary to ensure continued success. Administrators have the greatest influence on the success of fall prevention programs.

#### Physicians and Clinicians
<u>Prescribers, Supervisors, Facilitators, and Reporters</u>:

Practice their professions within the framework of MA, Federal, & internal facility standards including Golden Falls Program as organized, directed, and controlled by the Administrator or their designee(s).

#### Certified Nurse's Aides (CNA'S)
<u>Facilitators and Reporters</u>:

Practice their profession within the framework of MA, Federal, & internal facility standards including Golden Falls Program as directed by floor nurses, nursing management, and the Administrator or their designee(s).

Author: L. R. Youles, BS, LNHA

---

### NEW RECORDS RECEIVED, REVIEWED, AND RELIED UPON

15. I have received and reviewed the following records and testimony after my original report was released:

- Golden: CNA flow sheets;
- Golden: Physician orders;
- Golden: Monthly nursing summaries;
- Golden: Additional progress notes;
- Golden: Resident census records and progress reports;
- Golden: Punch detail reports and shift logs;
- Golden Medicare and Medicaid Cost Reports (2011 – 2013);
- Golden: February – March 2013 ADL flow sheets;
- Golden: Alternative facility report;
- 11/14/18 deposition transcript and exhibits of Kynda Almefty; and,
- 1/31/19 deposition transcript and exhibits of Ann Marie Morais.

**SUPPLEMENTAL FINDINGS**

16. The following chart identifies Golden Medicare Cost Report disclosures in 2013:

> **Medicare Cost Report Filing**
> **Golden Living Center - Heathwood (Golden)**
>
> | | |
> |---|---|
> | Reporting period: | 1/1/13 – 12/31/13 |
> | Licensed beds: | 73 |
> | Chain organization: | GGNSC, Fort Smith, AR |
> | Overall occupancy: | 53% |
> | Medicare occupancy: | 22% |
> | Home office and administrative costs: | $ 200,459 |
> | Net income: | - $ 675,370 |

**SUPPLEMENTAL OPINIONS**

17. I offer the following supplemental opinions based on the records previously identified in paragraph (15).

    A. It is important to recognize that Nursing Home Administrators have more influence over the success of a falls program that any other professional, including physicians, nurses, and clinicians. Please see paragraph (14).

    B. Preventing resident falls is challenging. However, there are some eldercare professionals who exploit these challenges by creating the false impression that no investment of resident assessment, care planning, close supervision, and vigilance really matters. They conveniently recite national fall statistics, and disregard state and federal regulations including the CMS Doctrine of Avoidable Accidents. In this case, Golden nursing staff dismissed their duty of supervision and protection by portraying Mr. Cohen as a noncompliant resident who acted outside the scope of their control.

    C. It would be inappropriate and misleading for Golden staff to claim that they were powerless to prevent Mr. Cohen's fall-related injury on 3/12/13. They admitted him knowing that he had a history of falls, and retained him despite a pervasive pattern of falls that validated his extremely high risk. In particular, facility officials were unwilling to provide the fall interventions and supervision that were necessary to protect him from trauma and injury. Therefore, they should have notified his POA that it was in their best interest to find a facility that could manage his unsafe ambulation and behavior. There is no documented evidence that his family was given this notice. Therefore, his continued stay at Golden after December 2011 constitutes a **NEGLIGENT RETENTION** in my opinion. Please see paragraph (13).

    D. **Mr. Cohen's unsafe ambulation was a constant problem**. Therefore, it would be irresponsible to claim that he posed a lower fall risk on 3/12/13 versus other periods of his stay, or versus his previous fall.

E. The CMS Doctrine of Avoidable Accidents has (2) components (i.e., duties) that determine whether a facility acted properly to protect at-risk residents. The first is <u>assistive devices</u>, which I characterize as **passive interventions**, because they represent supplies, equipment, devices, etc. The second is <u>supervision</u>, which I characterize as **active interventions**. There are several forms of active supervision, but the critical issue is determining whether the intervention is dedicated/direct or casual/intermittent. Like some facilities, Golden officials heavily relied on passive interventions to protect Mr. Cohen from falls, although there were occasions when active interventions were used. Unfortunately, none of the following active interventions appeared in his care plan, which **left his fall risk to chance**:

➢ 1:1 supervision during periods of unsafe ambulation
➢ Line-of-sight supervision at an actively occupied nurse's station
➢ Line-of-sight supervision in an actively occupied activities room
➢ Documented visual checks every 15 minutes
➢ Special CNA assignment to ensure line-of-sight
➢ **Other creative ways by staff to DIRECTLY supervise him**

<u>Golden staff appeared to dismiss these interventions, which if not available, should have prompted a family meeting to consider an alternative facility</u>. The claim that active interventions were decided by each nurse assigned to him, and were not required in his care plan to inform and guide all staff, is deflective, irresponsible, and set the stage for his fall on 3/12/13.

F. Reliance on deflective terms like noncompliance, reeducation, redirection, safety cues, reinforcement, etc., is a reliable indicator of a dysfunctional nursing facility that leaves resident safety to chance.

G. Mr. Cohen was a victim of **NEGLIGENT SUPERVISION** on 3/12/13 based on the following evidence:

➢ His fall was not witnessed by staff
➢ The exact time of his fall is unclear
➢ He was not being directly supervised
➢ His duration of time on the floor is unknown
➢ His duration of time in the corridor is unknown
➢ His duration of unsafe ambulation is unknown
➢ There is no indication when he was last seen by staff
➢ There is no evidence that his wheelchair alarm sounded
➢ There is no evidence that staff immediately responded to his alarm
➢ There is no evidence where staff was stationed when he fell
➢ There is no evidence that staff heard his alarm

H. Mr. Cohen was using a self-releasing wheelchair seatbelt that required staff to check on him every half hour and document this intervention every shift, although there is no way to validate the credibility of these flow sheets. Consequently, it would be irresponsible to claim that he was being closely supervised prior to his fall on 3/12/13 based on these unreliable records.

6

I.  There is no evidence that Mr. Cohen was examined at Golden by one of the following professionals after his fall on 3/12/13:

➢ A physician
➢ A nurse practitioner
➢ An RN

J.  As a nursing home administrator who is responsible for preventing resident accidents under state and federal regulations, I found Mr. Cohen's <u>falls care plan</u> to be cursory and heavily dependent on passive interventions. I came to this conclusion based on the following analysis:

➢ I removed interventions that all residents are entitled to
➢ I identified all passive fall interventions (i.e., equipment/devices)
➢ I removed unmeasurable interventions (i.e., no practical application)

The care plan interventions that remained reflected a lack of resolve by Golden to protect Mr. Cohen from accidents. Unfortunately, it appears that facility staff was waiting for a significant injury to occur before they took his fall risk seriously.

K.  As a nursing home administrator, I failed to see any analysis of Mr. Cohen's falls and unsafe ambulation to identify patterns of high risk behavior during certain periods of the day, or during certain activities and events.

L.  As a nursing home administrator, I recognize the value of physical therapy evaluations for fall risk residents like Mr. Cohen.  However, this intervention is a popular strategy by nursing staff to avoid addressing the issue of resident supervision. Unfortunately, devoting greater face-to-face staff time to high risk residents is the intervention of last resort in some facilities like Golden.

M.  Golden Living Center – Healthwood is operated by Golden Gate National Senior Care (GGNSC), and is classified as a **chain organization** according to Medicare and Medicaid Cost Report filings. Please see paragraph (16). During her 11/14/18 deposition testimony Kynda Almefty characterized the administration of Heathwood as autonomous and only requiring minimum consulting and support from GGNSC. Her portrayal of facility operations is contrary to my prior knowledge of the company and its practices.

## <u>CLOSING COMMENTS</u>

18. All opinions previously expressed in this report are offered to a reasonable degree of professional certainty.

19. All conclusions and opinions contained within this report are based on the records provided to me, my research, education, professional training, and experience.

20. I offer my opinions with confidence. However, I reserve the right to amend my report if significant additional information becomes available through discovery.

7

21. All opinions in this case are framed within the following three (3) domains:

    1. **<u>Regulatory standards</u>:**
       (i.e., Applicable nursing home and vulnerable adult laws and regulations);
    2. **<u>Administrative standards</u>:**
       (i.e., Facility governance, and the practice of nursing home administration); and,
    3. **<u>Institutional/Facility standards</u>:**
       (i.e., Nursing home industry, and facility/company policies, procedures, and practices).

    I do not offer clinical, medical, or scientific opinions.

22. I have testified in Massachusetts courts as a nursing home expert.

23. I have not prepared any exhibits at the present time. However, I reserve the right to refer to any documents reviewed as exhibits if I amend my report or provide testimony in this matter.

    Respectfully submitted:

    _____     March 25, 2019
    Lance R. Youles, BS, LNHA