UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JENNIFER KATZ, Personal Representative of the Estate of Donald Cohen, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 16-11078-LTS |
| GOLDEN GATE NATIONAL SENIOR CARE, LLC and GGNSC CHESTNUT HILL, LLC, | ) ) ) ) | |
| Defendants. | ) ) ) | |

ORDER ON MOTION TO STRIKE (DOC. NO. 61) AND
MOTION FOR SUMMARY JUDGMENT (DOC. NO. 63)

July 8, 2019

SOROKIN, J.

Plaintiff Jennifer Katz is suing Golden Gate National Senior Care, LLC ("Golden Gate") and GGNSC Chestnut Hill, LLC for the wrongful death of her father while he was a resident at Golden Living, a nursing home owned and operated by the defendants.[1] Ms. Katz claims that Golden Gate and Golden Living were negligent in caring for her father, and that as a result, he suffered a fall and thereafter died in the hospital. The defendants collectively moved to strike the report of Ms. Katz's expert and for summary judgment. Ms. Katz opposed both motions.

---

[1] The parties refer to the nursing home where Mr. Cohen lived interchangeably as "GGNSC Chestnut Hill," "Golden Living – Heathwood," and "Golden Living." While the record suggests there are a number of facilities which bear the name "Golden Living" throughout the country, there is only one at issue in this case. For ease of reference, therefore, the Court refers to the nursing home where Mr. Cohen lived as "Golden Living."

I.     FACTS[2]

Donald Cohen was admitted to Golden Living, a nursing home, on August 5, 2011. Doc. No. 72 at 16. At that time, Mr. Cohen was seventy-nine years old and required twenty-four hour nursing care, supervision, and assistance with his daily living. Id. Mr. Cohen had multiple diagnoses relevant to his mental and physical wellbeing, including senile dementia. Id. at 17. Additionally, for over a year before he was admitted, he had been experiencing increasingly frequent falls. Id. at 16. When admitted to Golden Living, Mr. Cohen was "considered a high fall risk and exhibited wandering behavior throughout his stay at the Defendants' facility." Id.

Almost immediately after being admitted to Golden Living, Mr. Cohen began to experience falls. Id. Initially, the staff at Golden Living developed fall precautions relating to Mr. Cohen's wheelchair—such as assessing its size, locking mechanisms, and anti-tipping mechanisms—and referred him to physical therapy. Id. However, Mr. Cohen continued to fall while at Golden Living. Id. The staff did not make major changes to his fall prevention plan, other than adding a self-releasing seatbelt alarm to Mr. Cohen's wheelchair on April 1, 2012. Id. Mr. Cohen could unfasten the seatbelt and turn off the alarm, and indeed, he routinely did so. Id. The staff at Golden Living were aware that Mr. Cohen almost immediately began to disregard the seatbelt alarm and continued to suffer falls. Id. No additional "serious interventions" were made to prevent him from falling, even though additional interventions were listed as available in his nursing chart. Id. Additionally, during the period of time between March 2012 and March

---

[2] In accordance with the summary judgment standard, the facts are those over which there is no genuine dispute, and all reasonable inferences are drawn in the plaintiff's favor. The parties did not submit a combined statement of material facts; accordingly, the majority of the facts are drawn from the plaintiff's opposition to summary judgment, Doc. No. 72.

2013, "thirty residents suffered forty eight documented falls, resulting in six fractures and an additional subdural hematoma." Id. at 18.

On March 12, 2013, Mr. Cohen was sitting in his wheelchair at approximately 11:30 a.m., and "fell to the ground after trying to self ambulate," according to nurses' notes. Id. There were no nurses or other Golden Living staff present at the time of Mr. Cohen's fall, so it was unwitnessed. Id. Immediately after the fall, "Mr. Cohen was indicated as not being able to articulate his pain situation, and as having a large bump on his right temporal lobe that was very tender to touch." Id. An unidentified member of the Golden Living staff gave him ice for his head and initiated an observation period. Id. According to Ms. Katz, at no point during the observation period did Mr. Cohen receive an examination by a physician, a nurse practitioner, or a registered nurse.[3] Id. When Ms. Katz arrived at Golden Living that evening, she observed that Mr. Cohen had "extensive facial bruising" and insisted that he be taken to the hospital. Id. At the hospital, Mr. Cohen was diagnosed with a subdural hematoma. Id. He did not recover and died at the hospital six days later, on March 18, 2013. Id.

Ms. Katz filed a six-count complaint in Middlesex Superior Court, which the defendants timely removed to this Court. Doc. No. 1. The complaint alleges that each of the defendants wrongfully caused Mr. Cohen's death under Mass. Gen. Laws ch. 229, § 2. Counts I and IV allege negligence against Golden Gate and Golden Living, respectively, Counts II and V allege gross negligence, and Counts III and VI allege willful, wanton, and reckless conduct. Doc. No. 1-1.

---

[3] The facts submitted by Ms. Katz suggest that Mr. Cohen did receive some attention after his fall, at least in the form of receiving ice and having his injury documented in nursing notes. Beyond this, it is not clear who attended to Mr. Cohen or in what way. The basis for these statements by Ms. Katz is also not clear within the summary judgment record.

3

During discovery, Ms. Katz disclosed her expert, Lance Youles, who she plans to call to testify to the standards applicable to administration of a nursing home and the standard of care exercised by nursing home administrators. Docs. No. 67-2, 67-3. The defendants collectively moved to strike Mr. Youles's expert report on the theories that Mr. Youles is not qualified to opine on the nursing standard of care or on the causes of Mr. Cohen's death. Doc. No. 62. Ms. Katz opposed on the grounds that Mr. Youles would only offer opinions on administrative, regulatory, and institutional standards of nursing homes and nursing home operations, which she asserts he is qualified to do. Doc. No. 67.

The defendants also moved for summary judgment on the theories that there is no vicarious liability by which to hold Golden Gate liable and that Ms. Katz has no expert to testify to the nursing standard of care or to causation. Doc. No. 64. Ms. Katz opposed on both grounds. Doc. No. 72.

The Court heard argument on each of these motions on June 19, 2019.

II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st

Cir. 1993). However, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

III. DISCUSSION

Because the relevance and admissibility of Mr. Youles's testimony depends upon Ms. Katz's theory of liability, the Court first addresses the motion for summary judgment, specifically, the elements of the asserted claims. The Court then turns to the question of whether Mr. Youles may offer an expert opinion related to any or all of those claims. The Court addresses these claims as against Golden Living before considering the question of vicarious liability.

    A. Negligence Claim Against Golden Living

Count IV alleges that Golden Living was negligent in caring for Mr. Cohen, thereby causing his death. Ms. Katz's theories of liability, gleaned from both the papers submitted and the oral arguments presented, are that Golden Living was negligent in 1) establishing a "fall intervention plan,"[4] 2) failing to evaluate and update that plan with additional precautions after Mr. Cohen continued to fall, 3) not properly supervising him on March 12, 2013, and 4) failing to provide him with medical evaluation and treatment for nine hours after his March 12, 2013 fall.

As an initial matter, the Court addresses the defendants' contention that Ms. Katz's claims are really claims for medical malpractice. Because Ms. Katz asserts a general negligence claim, rather than a medical malpractice claim, the Court compares the elements of each type of

---

[4] Neither party has submitted a "fall intervention plan," a "nursing care plan," or any evidence relating to what plans Mr. Cohen had, who created such plans, and who was responsible for updating them. In oral argument, counsel for Ms. Katz argued that the nursing home administrator creates those plans, and the nurses and doctors simply follow them; however, Ms. Katz has submitted neither any evidence nor any laws to support this assertion.

5

claim to her asserted theories of liability. In Massachusetts, "a medical malpractice plaintiff must show (1) the existence of a doctor or nurse-patient relationship, (2) that the performance of the doctor or nurse did not conform to good medical practice, and (3) that damage resulted therefrom." St. Germain v. Pfeifer, 637 N.E.2d 848, 851 (Mass. 1994). In contrast, a plaintiff asserting a negligence claim under Massachusetts law must prove that "(1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage." Brown v. United States, 557 F.3d 1, 3 (1st Cir. 2009) (citing Jupin v. Kask, 849 N.E.2d 829, 835 (Mass. 2006)).

Ms. Katz bases her contention that this is not a medical malpractice claim on the theory that it was really the Golden Living administrator who was ultimately responsible for the "fall intervention plan" which Mr. Cohen was placed on and which Ms. Katz claims was not reasonably updated over time. Additionally, she asserts that the administrator is responsible for overseeing all operations of the nursing home, including ensuring that the medical and non-medical staff alike are abiding by all relevant laws. Because the administrator is not a medical professional, there is no "doctor or nurse-patient relationship" upon which to base a medical malpractice claim, she argues.

In support of their argument that Ms. Katz's claims are in fact ones for medical malpractice, the defendants point to certain regulations involving the provision of nursing care. In Massachusetts, nurses are responsible for planning and implementing nursing interventions, assessing the needs of a patient, and evaluating the effectiveness of the nursing plan developed. See 244 Code Mass. Regs. § 3.00 et seq. Additionally, "[f]ormulation of the plan of nursing care and evaluation of the patient's/client's response to the care provided" are nursing activities which may not be delegated. Id. § 3.05(5)(c).

6

In contrast, Ms. Katz's expert, Mr. Youles, points to several regulations governing nursing home administrators. Such regulations state that "[t]he administrator of the facility shall be responsible to the licensee and shall operate the facility to ensure services required by residents at each level of care are available on a regular basis and provided in an appropriate environment in accordance with established policies." 105 Code Mass. Regs. § 150.002(c). However, these regulations also state that in facilities providing skilled nursing care (which Golden Living appears from the parties' papers to be), "the resident's care plan shall include a comprehensive, nursing care plan for each resident developed by the nursing staff in relation to the resident's total health needs." Id. § 150.007(D). Such plan

> shall include diagnoses, significant conditions or impairments, medication, treatments, special orders, diet, safety measure, mental condition, bathing and grooming schedules, activities of daily living, the kind and amount of assistance needed, long-term and short-term goals, planned resident teaching programs, encouragement of resident's interests and desirable activities. It shall indicate what nursing care is needed, how it can best be accomplished, and what methods and approaches are most successful. This information shall be readily available for use by all personnel involved in resident care.

Id. § 150.007(D)(1).

Under Massachusetts law, each of the four theories of negligence identified by Ms. Katz involves a nursing decision not subject to delegation to non-medical staff: 1) what the appropriate "fall intervention plan" was, in accordance with the nursing standard of care; 2) whether such plan reasonably should have been updated after Mr. Cohen continued to fall; 3) whether Mr. Cohen should have been under observation at the time he fell on March 12, 2013, and 4) whether Mr. Cohen should have been given a medical evaluation and treatment after his fall on March 12, 2013. Accordingly, each of these theories presents a medical malpractice claim.

There is no dispute that Mr. Cohen had a nurse-patient relationship with the nursing staff at Golden Living. Rather, the dispute centers around the second and third elements of a medical malpractice claim: whether the performance of the nurses conformed to good medical practice and whether damage resulted therefrom. "Generally, a plaintiff in a medical malpractice action may carry his or her burden of proof on the issues of negligence and causation only with the assistance of expert testimony." Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998). This is because questions about the appropriate standard of care and causation will often lie outside the realm of the average juror's knowledge, and the expert testimony will assist the jury. See Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.").

In this case, three of Ms. Katz's four theories require expert testimony to proceed. As to the first theory, proving that Mr. Cohen's "fall intervention plan" conformed to the nursing standard of care would require expert testimony as to what the applicable standard of care is in developing such plans and whether Mr. Cohen's plan, when created upon admission, fell below that standard. It is undisputed that Ms. Katz has not disclosed an expert with experience as a nurse. The defendants move to strike the only expert she has disclosed, Mr. Youles, on the basis that he cannot testify to the nursing standard of care. Assuming without deciding that a nursing home administrator may, in some cases, be sufficiently experienced or otherwise qualified to testify to the standard of care applicable to nurses in developing a fall intervention plan upon a resident's arrival, Mr. Youles has not offered such an opinion. Accordingly, summary judgment is ALLOWED as this theory of negligence.

Similarly, the third theory (that Mr. Cohen should have been supervised at the time of his fall) also cannot proceed to trial. The summary judgment evidence suggests that Mr. Cohen's fall intervention plan included a requirement that he or his seatbelt be checked at periodic intervals.[5] See Docs. No. 62-3 at 9, 62-4 at 7. To the extent this theory of negligence asserts that the nurses at Golden Living did not in fact follow this plan and perform the required periodic checks, Ms. Katz has submitted no evidence on this matter, and thus summary judgment is appropriate.[6]

To the extent this theory asserts instead that it was negligent to not have "1:1 supervision" or "[l]ine-of-sight supervision" of Mr. Cohen at all times, as suggested by Mr. Youles, expert opinion is required to help the jury to understand why, given his particular diagnoses, history, and risks in light of the then-existing provisions of the fall intervention plan, as well as other reasonably available accommodations, not including constant supervision in Mr. Cohen's plan fell below the applicable standard of care. Mr. Youles has offered the bare opinion that the level of supervision in Mr. Cohen's care plan was negligent but has not presented any evidence or opinion relating to the nursing standard of care applicable to such plans.[7] See id. In

---

[5] Given that the fall intervention plan was not submitted to the Court, it is unclear from the summary judgment record how frequently the plan required the nurses to check Mr. Cohen. Mr. Youles refers to both 15-minute checks and half-hour checks in his two expert reports.

[6] Experts may generally rely upon facts not otherwise before the Court in forming an opinion, as is the case here, as long as the facts are of the type upon which experts in that particular field would reasonably rely. Fed. R. Evid. 703. However, to prove the relevant facts—that the fall intervention plan included periodic checks or that the staff failed to perform these checks—for any purpose other than the reliance on them by the expert, for example as substantive evidence, Ms. Katz would need to offer admissible evidence of these facts. That is, these facts are not established for substantive purposes simply because they are included in an expert report and relied upon by an expert.

[7] Again, the Court assumes without deciding that a nursing home administrator could, in some cases, be qualified to testify to the nursing standard of care applicable to the development of fall intervention plans. As Mr. Youles has not offered an opinion relating to such standard of care in this case, the Court need not decide at this time whether he in fact would be qualified to do so.

fact, Ms. Katz states specifically that "Lance Youles will not be offering any testimony relating to the nursing standard of care." Doc. No. 72 at 13. The fall intervention plan requires nursing judgment, as previously explained, and therefore Ms. Katz has not presented sufficient evidence to survive summary judgment on the theory that the nursing staff were negligent for not supervising Mr. Cohen at the time of his fall. Accordingly, summary judgment is ALLOWED as to this theory of negligence.

As to the fourth theory, that the nursing staff were negligent by not evaluating or treating Mr. Cohen in the nine hours after his March 12, 2103 fall, expert testimony is not necessarily required to determine that it was not "good medical practice" to withhold medical treatment for nine hours from an elderly man who fell and hit his head, which is what the summary judgment evidence indicates. These facts speak for themselves. However, expert testimony would certainly be required to prove that the failure to provide medical evaluation or treatment during that nine-hour window was causally related to Mr. Cohen's death, which occurred six days later. In other words, whether the nine-hour delay caused his death is a question which requires expert testimony on medical causation, which Ms. Katz indisputably does not have. Accordingly, summary judgment is also ALLOWED as to the fourth theory of negligence.

However, Ms. Katz's second theory of negligence presents different issues than the other three theories. For purposes of summary judgment, the Court accepts as true that Mr. Cohen routinely fell while at Golden Living and that after April 1, 2012, when the seatbelt alarm was added to his "fall intervention plan," no additional "serious interventions" were considered or implemented, though multiple were listed as available and though he continued to experience relatively frequent falls. An expert is not required for the jury to conclude that it was negligent to do <u>nothing</u> in terms of Mr. Cohen's fall plan for almost one year, though he regularly

10

continued to fall. Simply put, an ordinary lay juror well understands, without expert testimony, whether leaving unchanged a fall prevention plan in the face of repeated falls by an elderly man suffering senile dementia violates the standard of care.[8] Compare Lipman v. Lustig, 190 N.E.2d 675, 676 (Mass. 1963) (holding that no expert testimony was required on issue of negligence where the defendant dropped a dental tool down the plaintiff's throat because in such circumstances, "the jury were competent from their own common knowledge and experience, unaided by expert opinion testimony, to pass upon the question of the defendant's negligence"), with Hellenga v. Ferguson, 931 N.E.2d 515 (Mass. App. Ct. 2010) ("In this case, where the defendant performed a complex surgical procedure on the plaintiff, the jurors would not be competent to determine, based on their own knowledge and experience, whether the defendant was negligent.").

Accordingly, summary judgment is DENIED on Count IV, insofar as Ms. Katz asserts a theory of liability that the Golden Living staff was negligent by failing to evaluate and update Mr. Cohen's "fall intervention" or nursing plan with additional precautions after April 1, 2012.

B. Gross Negligence and Reckless Conduct Claims Against Golden Living

Count V alleges that Golden Living was grossly negligent in caring for Mr. Cohen, thus resulting in his death. The SJC has defined gross negligence and explained how it differs from ordinary negligence as follows:

> Negligence, without qualification and in its ordinary sense, is the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular

---

[8] There is evidence in the summary judgment record that other interventions were "available" to be added to Mr. Cohen's plan but were not implemented. See Doc. No. 72 at 17. Even if some of these interventions or other similar measures were in fact implemented, neither party has suggested, let alone submitted evidence, of such. Accordingly, this would not defeat summary judgment, but rather might provide additional evidence for the jury to consider at trial.

11

> circumstances. It is a want of diligence commensurate with the requirement of the duty at the moment imposed by the law. Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct which renders a defendant who has injured another liable to the latter even though guilty of contributory negligence, or which renders a defendant in rightful possession of real estate liable to a trespasser whom he has injured. It falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong. Ordinary and gross negligence differ in degree of inattention, while both differ in kind from willful and intentional conduct which is or ought to be known to have a tendency to injure.

Altman v. Aronson, 121 N.E. 505, 506 (Mass. 1919).

Additionally, Count VI alleges that Golden Living willfully, wantonly, and recklessly disregarded its obligations in caring for Mr. Cohen, thus resulting in his death. The SJC's "practice has been simply to refer to reckless conduct as constituting the conduct that produces liability for what the court has traditionally called wilful, wanton, or reckless conduct." Sandler v. Com., 644 N.E.2d 641, 643 (Mass. 1995). In cases alleging a reckless failure to act, the SJC has defined such conduct to

> involve[] an intentional or unreasonable disregard of a risk that presents a high degree of probability that substantial harm will result to another. The risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the defendant's election to run that risk or of his failure reasonably to recognize it.

Id. While "differentiating neatly between negligent conduct (including grossly negligent conduct) and reckless conduct" is difficult, it is important to recognize "the requirement that

reckless conduct must be based on a high degree of risk that death or serious bodily injury will result from a defendant's action or inaction when under a duty to act." Id. at 644.

The claims alleging gross negligence and willful, wanton, or reckless conduct are not appropriate for resolution at the summary judgment stage of this case. Whether Golden Living's actions rose to the level of gross negligence or recklessness are fact-intensive questions which raise issues relating to the defendants' knowledge and appreciation of risk, appropriate for resolution at trial. Accordingly, the motion for summary judgment is DENIED on Counts V and VI insofar as each is based upon the same theory of liability relating to the failure to update Mr. Cohen's "fall intervention" or nursing plan after April 1, 2012.

  C. Claims Against Golden Gate

In light of the Court's ruling on Counts IV, V, and VI, the only theory by which to hold Golden Gate liable is upon the same theory of negligence that survives summary judgment against Golden Living. The defendants argue that Golden Gate cannot be held liable for any alleged wrongdoing on the part of the nurses employed at Golden Living because there is no vicarious liability. Doc. No. 64 at 5. In response, Ms. Katz argues that Golden Gate is vicariously liable for the negligence of Golden Living because it has the right and ability to control Golden Living. Doc. No. 72 at 7.

Whether Golden Gate is vicariously liable for any negligence on the part of the Golden Living staff is a question which presents a genuine dispute of material fact, and accordingly, is not appropriate for resolution at summary judgment. Therefore, the motion for summary judgment is DENIED on Counts I, II, and III insofar as each is based upon the same theory of liability relating to the failure to update Mr. Cohen's "fall intervention" or nursing plan after April 1, 2012.

D. Motion to Strike

Whether Mr. Youles's testimony will be relevant at trial in light of the Court's ruling is a question better resolved at trial. Although the Court does not allow the case to proceed on a theory of negligence relating to the actions of the Golden Living administrator, Mr. Youles' opinions may still have some relevance to the remaining theory of liability. Accordingly, the motion to strike, Doc. No. 61, is DENIED without prejudice to raising the issue as a motion in limine before trial.

IV. CONCLUSION

The motion for summary judgment, Doc. No. 63, is DENIED, as discussed herein. The motion to strike, Doc. No. 61, is DENIED without prejudice. By August 2, 2019, the parties shall file a joint status report stating: 1) a proposed date or time period for trial, 2) the anticipated length of trial, and 3) whether both parties (without revealing the individual positions of each party) do or do not consent to trial before Magistrate Judge Kelley.[9]

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[9] While the parties previously consented to trial before Judge Kelley when it appeared that the undersigned could not conduct the trial as scheduled, in light of the cancellation of the original trial date at the request of the parties, the parties may now revisit their consent decision.